**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ELIZABETH HERRERA, Derivatively on Behalf of ONESPAN, INC.<br><br>             Plaintiff,<br><br>v.<br><br>MARC D. BORODITSKY, MICHAEL P. CULLINANE, JOHN N. FOX, JR., JEAN K. HOLLEY, T. KENDALL HUNT, MATTHEW MOOG, MARC ZENNER, SCOTT M. CLEMENTS, AND MARK S. HOYT,<br><br>             Defendants,<br>and,<br><br>ONESPAN INC.,<br><br>             Nominal Defendant. | Case No. |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Elizabeth Herrera ("Plaintiff") by and through her undersigned counsel, derivatively on behalf of Nominal Defendant OneSpan, Inc. ("OneSpan" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by OneSpan with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of OneSpan against certain of its officers and directors seeking to remedy Individual Defendants' (as defined below) breach of fiduciary duties and unjust enrichment that occurred from May 9, 2018 through the present (the "Relevant Period").

2.      The Company, together with its subsidiaries, designs, develops, and markets digital solutions for identity, security, and business productivity worldwide.

3.      Throughout the Relevant Period, materially false, and misleading statements were made regarding the Company's business, operational, and compliance policies.  The Individual Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had inadequate disclosure controls and procedures, and internal control over financial reporting; (2) as a result, the Company overstated its revenue relating to certain contracts with customers involving software licenses in its financial statements spread out over the quarters from the first quarter of 2018 to the first quarter of 2020; (3) as a result, it was foreseeably likely that the Company would eventually have to delay one or more scheduled earnings releases, conference calls, and/or financial filings with the SEC; (4) the Company downplayed the negative impacts of errors in its financial statements; (5) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.      On August 4, 2020, the Individual Defendants caused the Company to postpone its second quarter 2020 earnings release and conference call by one week, attributing the delay to prior-period revenue recognition problems relating to certain software license contracts spread out over the quarters from the first quarter of 2018 to the first quarter of 2020.  The Company further

stated that "[t]he net contract assets that originated from a portion of these contracts in prior periods were not properly accounted for in subsequent periods, which caused overstatements of revenue."

5.     On August 11, 2020, the Company disclosed that it would not timely file its quarterly report for the quarter ended June 30, 2020 with the SEC; reported that same quarter year-over-year revenues had declined; and withdrew its full year 2020 earnings guidance, which the Company had affirmed one quarter earlier.

## JURISDICTION

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

8.     Plaintiff is a current shareholder of the Company common stock and has continuously held OneSpan common stock since 2015. Plaintiff is a citizen of Maryland.

9.     Nominal Defendant OneSpan is a Delaware corporation with principal executive offices located at 121 West Wacker Drive, Suite 2050, Chicago, Illinois 60601.

10.     Defendant Marc D. Boroditsky ("Boroditsky") has been a director since June 2019. Boroditsky is a member of the Audit Committee, Compensation Committee, and Corporate Governance and Nominating Committee. Upon information and belief, Boroditsky is a citizen of California.

11.     Defendant Michael P. Cullinane ("Cullinane") has been a director since April 1998. Cullinane is the Chairman of the Company's Audit Committee and a member of the Company's Compensation Committee, and Corporate Governance and Nominating Committee. Upon information and belief, Cullinane is a citizen of Florida.

12.     Defendant John N. Fox, Jr. ("Fox") has been a director since April 2005.  Fox is Chairman of the Board of Directors (the "Board"), Chairman of the Company's Compensation Committee, and is a member of the Audit Committee and Corporate Governance and Nominating Committee.  Upon information and belief, Fox is a citizen of Illinois.

13.     Defendant Jean K. Holley ("Holley") has been a director since August 2006. Holley is Chair of the Corporate Governance and Nominating Committee and a member of the Audit Committee and Compensation Committee. Upon information and belief, Holley is a citizen of Georgia.

14.     Defendant T. Kendall Hunt ("Hunt") is the Founder and former Chief Executive Officer ("CEO") and Chairman of the Board.  Hunt served as Chairman of the Board from 1997 until 2018.  Hunt was the Company's CEO from 1997 through 1999 and again from 2002 to 2017. Hunt owns 6,558,589 shares of Company stock or 16.3% of the outstanding shares. Upon information and belief, Hunt is a citizen of Illinois.

15.     Defendant Matthew Moog ("Moog") has been a director since December 2012. Moog is a member of the Audit Committee, Compensation Committee, and Corporate Governance and Nominating Committee. Upon information and belief, Moog is a citizen of Illinois.

16.     Defendant Marc Zenner ("Zenner") has been a director since June 2019. Zenner is a member of the Audit Committee, Compensation Committee, and Corporate Governance and Nominating Committee.  Upon information and belief, Zenner is a citizen of Connecticut.

17.     Defendant Scott Clements ("Clements") has served as the Company's CEO at all relevant times. Upon information and belief, Clements is a citizen of Illinois.

18.     Defendant Mark S. Hoyt ("Hoyt") has served as the Company's Chief Financial Officer ("CFO") at all relevant times.  Upon information and belief, Hoyt is a citizen of Illinois.

19.     Boroditsky, Hunt, Cullinane, Fox, Holley, Moog, Clements, Hoyt, and Zenner are collectively referred to herein as the Individual Defendants.

## INDIVIDUAL DEFENDANTS' DUTIES

20.     By reason of their positions as officers, directors, and/or fiduciaries of OneSpan and because of their ability to control the business and corporate affairs of OneSpan, the Individual Defendants owed OneSpan and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage OneSpan in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of OneSpan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to OneSpan and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of OneSpan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with OneSpan, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

22.     To discharge their duties, the officers and directors of OneSpan were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of OneSpan were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

23.     The Board has constituted and established an Audit Committee with authority, responsibility, and specific duties as described in this Audit Committee Charter (the "Charter"). The Audit Committee Charter places the following responsibilities on its members:

a.  Review and discuss with the Company's management and its registered public accounting firm each of the Company's annual audited and quarterly financial statements, including, (a) in the case of the annual audited financial statements, the report of the public accounting firm, (b) in the case of the quarterly financial statements, the results of the public accounting firm's review thereof, and (c) in all cases, related financial disclosures (*e.g.*, Management's Discussion and Analysis of Financial Condition and Results of Operations) that are included in reports to be filed with the SEC, prior to such reports being filed. Discussions with management and the Company's registered public accounting firm shall include all items that are required to be communicated by the registered public accounting firm under the then applicable Statements on Auditing Standards;

b.  Determine whether it will recommend to the Board that the Company's annual audited financial statements be included in the Company's Annual Report on Form 10-K;

c.  Review and discuss with the Company's management and its registered public accounting firm the Company's quarterly and annual earnings press releases, including the use of any "pro forma," "adjusted" or other non-GAAP information, prior to the issuance of the release to the public; and

d.  Review and discuss with the Company's management the release of any financial or other related data that may provide guidance to analysts, rating agencies, and others. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

## SUBSTANTIVE ALLEGATIONS

24.     On May 8, 2018, the Company issued a press release reporting its financial and operating results for the first quarter of 2018 (the "1Q18 Press Release"). The 1Q18 Press Release reported that "[r]evenue for the first quarter of 2018 increased 8% to $45.4 million from $42.0 million in the first quarter of 2017," and that software licenses revenue was $16.003 million for the quarter.

25.     The 1Q18 Press Release also quoted Defendant Clements who stated that the Company "reported record non-hardware revenue in the first quarter with strong contributions from software licenses and subscriptions"; that this "success was underscored by the doubling of [the Company's] mobile security software and an increase of nearly 50% in [the Company's] e-signature solutions"; and that "[s]trong software and services revenue combined with expected Q1 declines in hardware revenue contributed to a higher gross profit margin."

26.     On May 9, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q affirmed the Company's revenue results reported in the 1Q18 Press Release, including the figure reported for software licenses revenue.

27.     With respect to how the Company accounts for license revenue, the 1Q18 10-Q represented that "[r]evenue from the sale of software licensing is recorded upon the latter of when the customer receives the ability to access the software or when they are legally allowed to use the software"; that "[n]o significant obligations or contingencies exist with regard to delivery, customer acceptance or rights of return at the time revenue is recognized"; that "[c]ustomer payments normally correspond with delivery for perpetual licenses"; that, "[f]or term licenses, payments are either on installment or in advance"; that the Company "ha[s] determined that,

8

consistent with [their] conclusion under prior revenue recognition rules, [they] act as the principal with respect to the satisfaction of the related performance obligation and record the corresponding revenue on a gross basis from these transactions"; and that "[t]he fees paid to the third parties are recognized as a component of cost of sales when the revenue is recognized."

28.     With respect to how the Company recognized revenue following the Company's adoption of Accounting Standards Update No. 2014-09 "Revenue from Contracts with Customers" (FASB Accounting Standards Codification (ASC) Topic 606, or "Topic 606"), the 1Q18 10-Q stated that the Company "determine[s] revenue recognition through . . . [i]dentification of the contract, or contracts, with a customer," "[i]dentification of the performance obligations in the contract," "[d]etermination of the transaction price," "[a]llocation of the transaction price to the performance obligations in the contract," and "[r]ecognition of revenue when, or as, [they] satisfy a performance obligation"; that "[r]evenues are recognized when control of the promised goods or services is transferred to [the Company's] customers, in an amount that reflects the consideration [the Company] expect[s] to be entitled to in exchange for those products or services, which excludes any sales incentives and amounts collected on behalf of third parties"; that "[t]axes assessed by a governmental authority that are both imposed on and concurrent with a specific revenue-producing transaction, that are collected by the Company from a customer, are excluded from revenue"; and that "[s]hipping and handling costs associated with outbound freight after control over a product has transferred to a customer are accounted for as a fulfillment cost and are in [sic] included in cost of revenues."

29.     With respect to the Company's disclosure controls and procedures, the 1Q18 10-Q represented that the Company's "management, with the participation of [the Company's] Chief Executive Officer and Chief Financial Officer . . . conducted an evaluation of the effectiveness of

[the Company's] disclosure controls and procedures . . . as of the end of the period covered by this Quarterly Report on Form 10-Q"; that "[d]isclosure controls and procedures include, without limitation, controls and procedures designed to ensure . . . the information required to be disclosed by [the Company] in [its] reports that [the Company] file[s] or submit[s] under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the [SEC]'s rules and forms," as well as that "information required to be disclosed by [the Company] in [their] reports that [they] file or submit under the Exchange Act is accumulated and communicated to [the Company's] management, including [the] principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure"; and that the Company's "disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives."

30. With respect to changes in internal controls, if any, that occurred during the quarter covered by the 1Q18 10-Q, the 1Q18 10-Q stated that, "[e]ffective January 1, 2018, [the Company] adopted Accounting Standards Codification 606 ('ASC 606'), 'Revenue from Contracts with Customers'"; that "[c]hanges were made to the relevant business processes and the related control activities in order to monitor and maintain appropriate controls over financial reporting"; that "[t]hese included the development of new entity-wide policies based on the five step model provided in the revenue recognition standard, new training, ongoing contract review requirements, and gathering of information provided for disclosures"; and that, "[o]ther than the changes noted above, there were no changes in [the Company's] internal control over financial reporting during the quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, [the Company's] internal control over financial reporting."

31.     Further, the 1Q18 10-Q contained generic, boilerplate representations regarding the risks inherent in "all control systems."   The 1Q18 10-Q represented that the Company's "management, including [its] Chief Executive Officer and Chief Financial Officer, do not expect that [the Company's] disclosure controls and procedures or internal control over financial reporting will prevent all error and all fraud"; that "[a] control system, no matter how well designed and implemented, can provide only reasonable, not absolute, assurance that the control system's objectives will be met"; that "the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs"; that, "[b]ecause of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company are detected"; that "[t]he inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple errors or mistakes"; that "[c]ontrols can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls"; that "[t]he design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions"; that "[p]rojections of any evaluation of controls' effectiveness to future periods are subject to risks"; that, "[o]ver time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures"; and that, "[b]ecause of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected."   The foregoing risk warnings were generic, catch-all provisions that were not tailored to the Company's actual known risks regarding the Company's calculation of revenue for contracts with customers involving software licenses.

32. On July 26, 2018, the Company issued a press release reporting its financial and operating results for the second quarter of 2018 (the "2Q18 Press Release"). The 2Q18 Press Release stated that "[r]evenue for the second quarter of 2018 was $49.6 million, an increase of 8% from $45.7 million for the second quarter of 2017"; that "[r]evenue for the first six months of 2018 was $95.0 million, an increase of 8% from $87.7 million for the first six months of 2017"; and that software licenses revenue was $10.410 million and $26.413 million for the three and six months ended June 30, 2018, respectively.

33. The 2Q18 Press Release also quoted Defendant Clements who stated that "[t]he second quarter marked a significant turning point for OneSpan™, with a global rebrand, the launch of [the Company's] Trusted Identity platform and the acquisition of identity verification innovator, Dealflo," each of which that "was executed in support of [the Company's] software focused growth strategy"; and that, "[d]uring the quarter, [the Company] benefitted from strong growth in [inter alia] . . . increased software licenses."

34. On August 3, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q affirmed the Company's revenue results reported in the 2Q18 Press Release, including the figures reported for software licenses revenue. Further, the 2Q18 10-Q contained substantively the same statements as those referenced above.

35. The 2Q18 10-Q also represented that "[t]here were no changes in [the Company's] internal control over financial reporting during the three months ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, [the Company's] internal control over financial reporting."

36.     On October 30, 2018, the Company issued a press release reporting its financial and operating results for the third quarter of 2018 (the "3Q18 Press Release").  the 3Q18 Press Release reported that "[r]evenue for the third quarter of 2018 was $52.5 million, an increase of 3% from $51.1 million for the third quarter of 2017"; that "[r]evenue for the first nine months of 2018 was $147.5 million, an increase of 6% from $138.8 million for the first nine months of 2017"; and that software licenses revenue was $9.826 million and $36.239 million for the three and nine months ended September 30, 2018, respectively.

37.     On November 2, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2018 (the "3Q18 10-Q").  The 3Q18 10-Q affirmed the Company's revenue results reported in the 3Q18 Press Release, including the figures reported for software licenses revenue.

38.     On February 19, 2019, the Company issued a press release reporting its financial and operating results for the fourth quarter and full year of 2018 (the "4Q/FY18 Press Release"). 4Q/FY18 Press Release reported that "[r]evenue for the fourth quarter of 2018 was$64.8 million, an increase of 19% from $54.5 million for the fourth quarter of 2017"; that "[r]evenue for the full year 2018 was $212.3 million, an increase of 10% from $193.3 million for the full year 2017"; and that software licenses revenue was $11.178 million and $47.417 million for the three and twelve months ended December 31, 2018, respectively.

39.     The 4Q/FY18 Press Release also quoted Defendant Clements who stated that the Company "had a very strong fourth quarter with revenue up 19% on solid contributions across our portfolio of [inter alia] software," and that "mobile security software licenses revenue grew more than 50%."

40.　　On March 15, 2019, the Company filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K affirmed the Company's revenue results reported in the 4Q/FY18 Press Release, including the figures reported for software licenses revenue. Defendants Clements, Hoyt, Fox, Cullinane, Holley, Hunt, and Moog signed the 2018 10-K.

41.　　While acknowledging that the Company's "disclosure controls and procedures were not effective as of December 31, 2018," because of a "material weakness in [the Company's] internal control over financial reporting," and that "the Company's internal control over financial reporting was not effective . . . as of December 31, 2018, due to the material weakness," the 2018 10-K simultaneously downplayed the impact of this deficiency by representing that "[t]hese control deficiencies led to immaterial misstatements . . . some of which were corrected by the Company prior to the issuance of the December 31, 2018 consolidated financial statements."

42.　　The 2018 10-K also downplayed the future impact or occurrence of future deficiencies by touting various remedial measures the Company had implemented to cure these deficiencies, stating that, "[d]uring the three months ended December 31, 2018, the Company initiated its remediation plan related to the material weakness that was identified in 2018"; that the Company "[has] hired, and plan[s] to continue hiring, additional accounting personnel with the requisite technical knowledge with respect to revenue recognition and internal control over financial reporting"; that the Company "will consider use of third party resources to ensure [they] have a sufficient complement of resources"; that the Company "[w]ill conduct an expanded training program for [their] new and existing personnel on internal control over financial reporting and accounting for revenue recognition"; that "[m]anagement will complete the implementation of a new comprehensive worldwide enterprise resource planning (ERP) system, effective January

14

1, 2019," which "will improve and enhance the Company's processes by increasing the level of automation, which is expected improve the efficiency and effectiveness of certain financial reporting and business processes"; that the Company "[d]esign[s], implement[s] and operate[s] effective process-level controls throughout each of the processes in which there were ineffectively designed and implemented controls during 2018"; that the Company "[d]esign[s] and implement[s] an effective continuous risk assessment processes to monitor changes that could significantly impact [their] internal control over financial reporting"; and that the Company "expect[s] remediation of the material weakness will be completed in fiscal year 2019."

43. On May 7, 2019, the Company issued a press release announcing its financial and operating results for the first quarter of 2019 (the "1Q19 Press Release"). 1Q19 Press Release reported that "[r]evenue for the first quarter of 2019 was $47.6 million, an increase of 5% from $45.4 million for the first quarter of 2018," and that software licenses revenue was $7.571 million for the quarter.

44. That same day, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q affirmed the Company's revenue results reported in the 1Q19 Press Release, including the figure reported for software licenses revenue.

45. While acknowledging that a material weakness still existed in the Company's disclosure controls and procedures and internal control over financial reporting, the 1Q19 10-Q continued to downplay this deficiency by touting the Company's remediation plan as described in the 2018 10-K, and by assuring investors that, "[a]dditionally, the Company concluded the implementation of a new global enterprise resource planning ('ERP') system during the three months ended March 31, 2019," which "has replaced [OneSpan's] existing operating and financial

systems and is designed to accurately maintain the Company's financial records, enhance operational functionality, and provide timely information to the Company's management team related to the operation of the business."

46.     The 1Q19 10-Q further assured investors that the Company "also implemented internal controls to ensure [they] adequately evaluated [their] contracts and properly assessed the impact of ASC 842 to facilitate the adoption on January 1, 2019, as well as [the Company's] on-going accounting."

47.     On July 25, 2019, the Company issued a press release reporting its financial and operating results for the second quarter of 2019 (the "2Q19 Press Release").   2Q19 Press Release reported that "[r]evenue for the second quarter of 2019 was $56.2 million, an increase of 13% from $49.6 million for the second quarter of 2018"; that "[r]evenue for the first six months of 2019 was $103.8 million, an increase of 9% from $95.0 million for the first six months of 2018"; and that software licenses revenue was $11.078 million and $18.649 million for the three and six months ended June 30, 2019, respectively.

48.     On July 31, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, the Company's financial and operating results for the quarter ended June 30, 2019 (the "2Q19 10-Q").   The 2Q19 10-Q affirmed the Company's revenue results reported in the 2Q19 Press Release, including the figures reported for software licenses revenue.

49.     Further, with respect to relevant accounting measures, the 2Q19 10-Q represented that, "[e]xcept for the accounting policies related to lease accounting . . . there have been no changes to significant accounting policies described in [2018 10-K] . . . that have had a material impact on the Company's condensed consolidated financial statements and related notes."

50.     On October 29, 2019, the Company issued a press release reporting its financial and operating results for the third quarter of 2019 (the "3Q19 Press Release").  The 3Q19 Press Release reported that "[r]evenue for the third quarter of 2019 was $79.7 million, an increase of 52% from $52.5 million for the third quarter of 2018"; that "[r]evenue for the first nine months of 2019 was $183.6 million, an increase of 24% from $147.5 million for the first nine months of 2018"; and that software licenses revenue was $19.154 million and $37.803 million for the three and nine months ended September 30, 2019, respectively.

51.     On October 30, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q affirmed the Company's revenue results reported in the 3Q19 Press Release, including the figures reported for software licenses revenue.

52.     On March 3, 2020, the Company issued a press release reporting its financial and operating results for the fourth quarter and full year of 2019 (the "4Q/FY19 Press Release").  The 4Q/F19 Press Release reported that "[r]evenue for the fourth quarter of 2019 was $71.0 million, an increase of 10% from $64.8 million for the fourth quarter of 2018"; that "[r]evenue for the full year 2019 was $254.6 million, an increase of 20% from $212.3 million for the full year 2018"; and that software licenses revenue was $19.365 million and $57.168 million for the three and twelve months ended December 31, 2019, respectively.

53.     The 4Q/FY19 Press Release also quoted Defendant Clements who stated that the Company's "transformation continues to yield positive results as [the Company] enjoyed an impressive fourth quarter with [inter alia] software license revenue up 73% . . . contributing to total software revenue growth of 63%"; that "[t]otal revenue increased 20% to $255 million, [the Company's] highest year ever"; and that "total software revenue grew 26%."

54.     On March 16, 2020, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K affirmed the Company's full year revenue results reported in the 4Q/FY19 Press Release. Defendants Clements, Hoyt, Fox, Cullinane, Holley, Hunt, Moog, Zenner, and Boroditsky signed the 2019 10-K.

55.     The 2019 10-K also represented that the Company had remediated the material weakness in the Company's internal control over financial reporting identified in the 2018 10-K. In its discussion of changes of internal control over financial reporting, the 2019 10-K stated that "[d]uring the three months ended December 31, 2019, the Company finalized its remediation plan related to the material weakness that was disclosed in [the 2018 10-K]"; that the Company "[is] satisfied that the material weakness in internal control over financial reporting identified as of December 31, 2018, has been remediated"; that the Company "[h]ired additional accounting personnel with the requisite technical knowledge with respect to revenue recognition and internal control over financial reporting and have used third party resources to ensure we have a sufficient complement of resources"; that the Company "[c]onducted an expanded training program for [their] new and existing personnel on internal control over financial reporting, accounting for revenue recognition, and other relevant accounting topics"; that the Company "[c]oncluded the implementation of a new global enterprise resource planning ('ERP') system," which "replaced [the Company's] previous operating and financial systems and is designed to accurately maintain the Company's financial records, enhance operational functionality, and provide timely information to the Company's management team related to the operation of the business"; that the Company "[d]esigned, implemented and operated effective process-level controls throughout each of the processes in which there were ineffectively designed and implemented controls as of

December 31, 2018"; that the Company "[d]esigned and implemented an effective continuous risk assessment processes to monitor changes that could significantly impact [the Company's] internal control over financial reporting"; and that, "[e]xcept for the changes in connection with [the Company's] finalization of the remediation plan discussed above, there have been no other changes in [the Company's] internal control over financial reporting . . . that occurred during the fourth quarter of 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

56. The 2019 10-K also represented that the Company's internal controls were effective.

57. On May 5, 2020, the Company issued a press release reporting its financial and operating results for the first quarter of 2020 (the "1Q20 Press Release"). The 1Q20 Press Release reported that "[r]evenue for the first quarter of 2020 was $56.5 million, an increase of 19% from $47.6 million for the first quarter of 2019," and that software licenses revenue was $18.522 million for the quarter. The 1Q20 Press Release also provided full year 2020 financial guidance of "[r]evenue in the range of $255 million to $265 million" and "[a]djusted EBITDA in the range of $24 million to $28 million."

58. On May 7, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q affirmed the Company's revenue results reported in the 1Q20 Press Release, including the figure reported for software licenses revenue.

**THE TRUTH EMERGES**

59. On August 4, 2020, the Individual Defendants caused the Company to issue a press release reporting that it was postponing its second quarter 2020 earnings release and conference

call by one week, attributing the delay to prior period revenue recognition problems relating to

certain software license contracts spread out over the quarters from the first quarter of 2018 to the

first quarter of 2020.  The press release stated:

> OneSpan . . . today announced it has changed the date it plans to release the company's second quarter 2020 earnings release and hold its earnings conference call, previously scheduled for August 4, 2020.
>
> During the second quarter of 2020, OneSpan identified immaterial errors that originated in prior periods. The errors relate to certain contracts with customers involving software licenses. The net contract assets that originated from a portion of these contracts in prior periods were not properly accounted for in subsequent periods, which caused overstatements of revenue. The current estimated cumulative overstatements of revenue through March 31, 2020 total between $2 million and $2.5 million and were spread out over the quarters from Q1 2018 to Q1 2020, representing less than 0.5% of total revenue in that time frame. The Company currently believes these errors to be immaterial. To correct these immaterial errors related to prior periods, the Company expects to adjust the prior period revenue and related amounts in its Form 10-Q for Q2 2020 and future filings with the SEC. The Company is evaluating the impact on its prior determination that internal control over financial reporting was effective as of December 31, 2019.
>
> OneSpan plans to report its second quarter 2020 financial results on Tuesday, August 11, 2020, after the market close.

60.     On August 11, 2020, the Company issued a press release reporting its financial and

operating results for the second quarter of 2020.   That press release reported that same quarter

year-over-year revenues had declined, and that the Company was withdrawing its full year 2020

earnings guidance, which the Company had affirmed one quarter earlier.  The press release stated:

> **Second Quarter 2020 Financial Highlights**
>
> Revenue for the second quarter of 2020 was $55.0 million, a decrease of 2% from $56.2 million for the second quarter of 2019. Revenue for the first six months of 2020 was $111.3 million, an increase of 8% from $103.3 million for the first six months of 2019.

***

**Full Year 2020 Outlook**

Given the increased uncertainty about the impact of the pandemic on the global economy and our customers, the Company believes it prudent to withdraw its previously issued full-year guidance. Management will provide additional commentary during its second quarter earnings conference call.

61.     That same day, the Individual Defendants caused the Company to file a notification of inability to timely file Form 10-Q on Form NT 10-Q with the SEC, disclosing that the Company could not timely file its quarterly report for the quarter ended June 30, 2020, by the original due date of August 10, 2020, because of the "immaterial errors" identified in the Company's August 4, 2020 press release.   The Form NT 10-Q stated:

OneSpan . . . has determined that it is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (the "Form 10-Q") by August 10, 2020, the original due date for such filing, without unreasonable effort or expense because it requires additional time to complete its financial statements. As previously announced, the Company identified immaterial errors related to certain contracts with customers involving term-based software licenses. The net contract assets that originated from a portion of these contracts in prior periods were not properly accounted for in subsequent periods, which caused overstatements of revenue. The cumulative overstatements of revenue total $2.2 million over the period from the first quarter in the year ended December 31, 2018 to the quarter ended March 31, 2020, representing less than 0.5% of total revenue in that time frame.

The Company believes these errors to be immaterial. To correct these immaterial errors related to prior periods, the Company expects to adjust the prior period revenue and related amounts in its Form 10-Q and future filings with the SEC.

62.     Following the issuance of the Company's August 11, 2020 press release and the filing of the Form NT 10-Q, the Company's common share price fell $12.36 per share, or 39.62%, to close at $18.84 per share on August 12, 2020.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

63.     Plaintiff brings this action derivatively in the right and for the benefit of OneSpan to redress the breaches of fiduciary duty and other violations of law by Defendants.

64. Plaintiff will adequately and fairly represent the interests of OneSpan and its shareholders in enforcing and prosecuting its rights.

65. The Board currently consists of the following nine (9) directors: Defendants Boroditsky, Cullinane, Fox, Holley, Hunt, Moog, Zenner, and non-parties Alfred Nietzel and Marianne Johnson.

**Defendant Hunt is Interested and Not Independent**

66. According to the Company's April 24, 2020 Proxy Statement filed on Schedule 14A, the Board has determined that Hunt is not an independent director within the meaning of NASDAQ rules because he has a relationship that would interfere with the exercise of his independent judgment in carrying out the responsibilities of a director.

67. Moreover, Defendant Hunt's ownership of 16.3% of the Company's outstanding and issued common stock, in conjunction with his role as founder and Chairman, and prior role as CEO, evidences that he is and has been the Company's controlling shareholder. Moreover, his large interest in Company stock – worth reveals his interest in maintaining the Company stock price as high as possible.

**Defendant Clement is Not Independent**

68. The principal professional occupation of Clement is his employment with OnesSpan as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.

69. Additionally, according to the Company's April 24, 2020 Proxy Statement filed on Schedule 14A, the Board has determined that Clement is not an independent director within the meaning of NASDAQ rules because he has a relationship that would interfere with the exercise of his independent judgment in carrying out the responsibilities of a director.

22

**A Majority of the Board Faces a Substantial Likelihood of Liability**

70.     Defendants Hoyt, Fox, Cullinane, Holley, Hunt, and Moog each signed the false and misleading 2018 Form 10-K.  Defendants Hoyt, Fox, Cullinane, Holley, Hunt, Moog, Zenner, and Boroditsky each signed the false and misleading 2019 Form 10-K.   The 2018 and 2019 Form 10-Ks were false and misleading because (1) the Company had inadequate disclosure controls and procedures, and internal control over financial reporting; (2) as a result, the Company overstated its revenue relating to certain contracts with customers involving software licenses in its financial statements spread out over the quarters from the first quarter of 2018 to the first quarter of 2020; (3) as a result, it was foreseeably likely that the Company would eventually have to delay one or more scheduled earnings releases, conference calls, and/or financial filings with the SEC; (4) the Company downplayed the negative impacts of errors in its financial statements; (5) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.  Thus, Defendants Hoyt, Fox, Cullinane, Holley, Hunt, Moog, Zenner, and Boroditsky each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**The Members of the Audit Committee Face a Substantial Likelihood of Liability**

71.     Demand is excused because Defendants Boroditsky, Cullinane, Fox, Moog, and Zenner face a substantial likelihood of liability for their misconduct.  During the Relevant Period, Defendants Boroditsky, Cullinane, Fox, Moog, and Zenner served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press

releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

72.     As members of the Audit Committee, Defendants Boroditsky, Cullinane, Fox, Moog, and Zenner knew, or should have known, that during as the Relevant Period (1) the Company had inadequate disclosure controls and procedures, and internal control over financial reporting; (2) as a result, the Company overstated its revenue relating to certain contracts with customers involving software licenses in its financial statements spread out over the quarters from the first quarter of 2018 to the first quarter of 2020; (3) as a result, it was foreseeably likely that the Company would eventually have to delay one or more scheduled earnings releases, conference calls, and/or financial filings with the SEC; (4) the Company downplayed the negative impacts of errors in its financial statements; (5) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

73.     Defendants Boroditsky, Cullinane, Fox, Moog, and Zenner breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Boroditsky, Cullinane, Fox, Moog, and Zenner face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duty

74.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

75.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

76.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

77.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials and internal controls.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

78.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

79.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing OneSpan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to OneSpan restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April 2, 2021

s/ *Daniel O. Herrera*

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
Daniel O. Herrera
Jennifer W. Sprengel
Kaitlin Naughton
150 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel: (312) 782-4880
Facsimile: (312) 782-4485
Email: dherrera@caffertyclobes.com
Email: jsprengel@caffertyclobes.com
Email: knaughton@caffertyclobes.com

*Liaison Counsel for Plaintiff*

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
James M. Ficaro
Four Tower Bridge
200 Barr Harbor Dr., Suite 400
West Conshohocken, PA 19428
Tel.: (610) 225-2677
Facsimile:  (610) 408-8062
Email: rw@weiserlawfirm.com
Email: jmf@weiserlawfirm.com

*Counsel for Plaintiff*

## **ONESPAN, INC. VERIFICATION**

I, Elizabeth Herrera, hereby verify that I am familiar with the allegations in the

Verified Shareholder Derivative Complaint, and that I have authorized the filing of the

Verified Shareholder Derivative Complaint, and that the foregoing is true and correct to

the best of my knowledge, information, and belief.

3/30/2021

Date:_____

DocuSigned by:

_____
2F40944B345A44D...

Elizabeth Herrera